Roger BERNARD

v.

CIVES CORPORATION (Northeast Constructors) and Lumbermens Mutual Casualty Company.

Supreme Judicial Court of Maine.

Dec. 28, 1978.

Patrick N. McTeague, Brunswick (orally), David Austin, Rumford, for plaintiff.

Richardson, Hildreth, Tyler & Troubh by Ronald D. Russell (orally), Robert L. Hazard, Portland, for defendant.

Before POMEROY, WERNICK, DELA-HANTY, GODFREY and NICHOLS, JJ.

WERNICK, Justice.

This is an appeal by an employer, Cives Corporation (hereinafter Cives) from a judgment of the Superior Court (Franklin County) affirming pro forma a decree of the Industrial Accident Commission.[1] The decree, dated December 6, 1977, was the culmination of Commission action upon Cives' petition for review of the incapacity of its employee, Roger Bernard, who was being paid compensation for total incapacity in consequence of a work-related injury sustained on May 24, 1976. At the time of the injury Bernard's average weekly wage was $299.00. The compensation paid him, $165.70 per week, reflected a rate of compensation for total incapacity based on the statutory ceiling applicable to Bernard at the time of his injury, 100% of the state-wide average weekly wage, as adjusted under the so-called "inflation-deflation" provision in 39 M.R.S.A. § 54 (Supp.1978).

In deciding the petition for review, the Commission found that the extent of Bernard's incapacity had changed from total to partial. It ordered that

"[t]he rate of compensation should be $199.33 from July 1, 1977 to the present date . . ."

and, to reflect the change in the extent of incapacity, that

"from the date of this decree the rate of compensation will be 40% of $199.33 . . . ."

Thereafter Cives, claiming that the Commission had inadvertently erred in computing the rate of compensation, asked that it be reduced. By a second order denying Cives' request, the Commission explained that the higher rate of compensation resulted from its determination that under the ceiling escalation amendments to 39 M.R.S.A. §§ 54, 55 (Supp.1978) Bernard was entitled to have his compensation benefits for total and partial incapacity computed on the basis of a higher ceiling of "133⅓% of . . . [the statewide] average weekly wage as of July 1, 1977."

Cives' appeal attacks the Commission's determination on alternative grounds. Cives says, first, that the Commission lacked power in the kind of proceeding before it to alter the rate of compensation as it purported to do. Alternatively, Cives contends that even if possessed of such power, the Commission here wrongly exercised it: Bernard's injury, sustained on May 24, 1976, did not qualify him for the ceiling escalation to 133⅓% of the statewide average weekly wage because the statute, correctly interpreted, had limited the operation of each ceiling increase through the use of separate effective dates and was thus applicable only as to injuries thereafter sustained.

We find each of Cives' contentions unacceptable and deny the appeal.

**1.**

■ It is clear to us that in acting upon Cives' petition for review of incapacity, the

---

1. Effective July 6, 1978 the name of the Industrial Accident Commission was changed to Workers' Compensation Commission. P.L. 1978, c. 612.

Commission, once it decided that the extent of Bernard's incapacity had changed, had not only the power but also the responsibility to fix the applicable rate of compensation in accordance with all the provisions of law bearing on that determination. That this is so is the plain thrust of the express language of 39 M.R.S.A. § 100 (Supp.1973):

> "Upon such review the commissioner may increase, diminish or discontinue such compensation . . . *in accordance with the facts, as the justice of the case may require.*" (emphasis supplied)

Further buttressing this conclusion is the provision in 39 M.R.S.A. § 104 (Supp.1978) authorizing modification of Superior Court pro forma decrees to conform to *subsequent* orders of the Commission

> "increasing, diminishing, terminating or commuting to a lump sum any payments of compensation . . . . "

Lastly, prior decisions of this Court indicate that the Commission had power to act as it did in the present instance. See, e. g., *Dufault v. Midland-Ross of Canada, Ltd.,* Me., 380 A.2d 200, 207 (1977); *Mullen v. Brown Homes, Inc.,* Me., 358 A.2d 557, 561 (1976).

### 2.

The Commission stated that in fixing the rate of compensation to be paid, it applied the "current provisions of Section 55." These have two basic components. First, they embody the amendments, effective October 1, 1975, which raised the prior ceiling limiting compensation payments to an amount not in excess of the statewide average weekly wage and which prescribed new ceiling levels at two-year intervals through July 1, 1981. Second, they require what has been referred to as an "inflation-deflation" adjustment to be made each year.

We address separately the Commission's application of these two basic facets of the statutory provisions.

2. Whether compensation is for total or partial incapacity or for death (benefits for which are also reached by this decision) the lost earning capacity that entitles workers, or their depend-

### 2–a.—The Ceiling Escalations.

█ We reject Cives' contention that Bernard cannot have the benefit of a higher ceiling stated in the statutes because his work-related injury was sustained prior to July 1, 1977.

We decide that persons continuing to receive compensation in consequence of work-related injuries suffered on or after October 1, 1975, the amounts of which are subject to a ceiling related to the statewide average weekly wage, are entitled to the benefit of each periodic escalation of the ceiling stated in the statute until their rates of compensation reach 200% of the statewide average weekly wage as computed July 1, 1981 or two-thirds of their lost earning capacity,[2] whichever is the lesser.

As amended, the statutory provisions here pertinent read as follows:

"*§ 54. Compensation for total incapacity*

"While the incapacity for work resulting from the injury is total, the employer shall pay the injured employee a weekly compensation equal to $\frac{2}{3}$ his average gross weekly wages, earnings or salary, but not more than the average weekly wage in the State of Maine as computed by the Employment Security Commission; *133⅓% of such average weekly wage as of July 1, 1977; 166⅔% of such average weekly wage as of July 1, 1979; and 200% of such average weekly wage as of July 1, 1981;* nor less than $25 weekly; and such weekly compensation shall be adjusted annually on July 1st so that it continues to bear the same percentage relationship to the average weekly wage in the State of Maine as computed by the Employment Security Commission, as it did at the time of the injury."

"*§ 55. Compensation for partial incapacity*

"While the incapacity for work resulting from the injury is partial, the employer shall pay the injured employee a weekly compensation equal to $\frac{2}{3}$ the differ-

ents, to compensation is uniformly stated by the statute as a function of their "average gross weekly wages, earnings or salary." See 39 M.R.S.A. §§ 54, 55 and 58 (Supp.1978).

ence, due to said injury, between his average gross weekly wages, earnings or salary before the injury and the weekly wages, earnings or salary which he is able to earn thereafter, but not more than the average weekly wage in the State of Maine as computed by the Employment Security Commission; *133⅓% of such average weekly wage as of July 1, 1977; 166⅔% of such average weekly wage as of July 1, 1979; and 200% of such average weekly wage as of July 1, 1981;* and such weekly compensation shall be adjusted annually on July 1st so that it continues to bear the same percentage relationship to the average weekly wage in the State of Maine as computed by the Employment Security Commission, as it did at the time of the injury." (emphasis indicates material added by amendments)

The focus of Cives' appeal is on the key words "as of", which are ambiguous. They may mean, as the Commission thought, "computed as of", or, as Cives maintains, "effective as of."

█ Cives' position rests on the foundational point that the Legislature enacted the ceiling escalator amendments while leaving unchanged the language of the previously-enacted provision calling for annual adjustments to accord with the impact of inflation (or deflation). Cives argues that this adjustment provision is written in plain language and should be given its strictly literal meaning to require that whatever was the percentage ratio at the time of the injury between the weekly compensation then payable and the then statewide average weekly wage must continue as the percentage ratio between the current weekly compensation paid and the current statewide average weekly wage. The Commission's decree, here, violates that mandate, says Cives. Since it orders that Bernard receive compensation in an amount which reflects adjustment not simply for the rise in the statewide average weekly wage but also for a ceiling escalation to 133⅓% of the statewide average weekly wage, it no longer

"continues to bear the same percentage relationship to the average weekly wage . . . as it did at the time of the injury."

We disagree with Cives' approach. We conclude that the "inflation-deflation" annual adjustment provision, properly interpreted, does not have the overriding impact on the ceiling escalation amendments attributed to it by Cives.

In interpreting the workers' compensation statute, we are guided not only by

"the necessity of liberally construing its provisions in order to accomplish the beneficent purposes intended . . ."

but also by a canon of interpretation applicable to statutes generally, that we "avoid incongruous . . . results." See *Levesque v. Levesque*, Me., 363 A.2d 951, 954 (1976). With this in mind, we perceive immediately that a strictly literal reading of the "inflation-deflation" adjustment provision assigning it the all-encompassing controlling effect for which Cives here contends produces an incongruity that cannot rationally be taken as the legislative intendment. At the time of his injury Bernard was totally incapacitated. Thus, Section 54 was in play, and the ratio of Bernard's compensation for total incapacity to the then statewide average weekly wage was 100%. On the strictly literal reading urged by Cives, Bernard's subsequent payments of compensation must continue to bear *that same 100%* ratio to the statewide average weekly wage. In the present instance this would mean that the Commission could not have ordered a 40% reduction to reflect the change in the extent of Bernard's incapacity from total to partial. Cives would be obliged to continue paying Bernard $165.70 every week, despite the extent of Bernard's incapacity. That is the amount reflecting *the 100% ratio* to statewide average weekly wage, established *at the time of the injury*, and thereafter to be maintained as a *constant*, if Cives' argument is carried to its logical conclusion.

In hindsight we can now readily discern why the textual language used by the Legislature produces this incongruity. Unfor-

tunately, the Legislature used the technique of inserting *identical* language keyed to the *time of injury* in three separate sections, apparently without realizing the consequences that would arise because two of the sections (54 and 55) plainly contemplate a change in status and all three of the sections are premised upon differing states of incapacity (or death) no particular one of which may have been that existing *at the time of injury*. In seeking to establish the ratio fixed at the time of injury as a *constant* to govern compensation payments thereafter, the Legislature overlooked, in using the methodology it did, the necessity of working into the formula a way to take into account variations in the extent of incapacity, or death, as they might occur *after* the time of the injury. If the statute is to be interpreted so as to produce rational results, we must deviate from a strictly literal reading of the language of the "inflation-deflation" adjustment provision if only to allow the percentage ratio established at the time of the injury to be varied to conform to subsequent variations in the extent of incapacity.[3]

Once we have thus perceived the necessity of departing from the textual language of the "inflation-deflation" adjustment provision to avoid incongruity, it becomes our responsibility to evaluate the *later-enacted* ceiling escalation provisions with this point uppermost in mind. Since the "inflation-deflation" adjustment provision must be reworked, it is appropriate that we first evaluate the later-enacted ceiling escalation provisions *on their own terms*, seeking thereby to ascertain their basic function and purpose. Having done this, we can then investigate whether the ceiling escalation provisions can be fairly implemented in accordance with their function and purpose consistently with an "inflation-deflation"

adjustment provision, which requires some degree of reformulation in any event, interpreted so as to afford it fair scope in fulfilling its own function and purpose.

■ Turning then to the analysis of the ceiling escalation provisions within their own confines, we find their broad purpose, not really in dispute between the parties, quite apparent. In response to the prompting of the National Commission on State Workmen's Compensation Laws, the Legislature sought to rectify a discriminatory and inequitable aspect of the compensation system whereby the relatively higher paid workers were prevented from receiving compensation at the statutory rate of two-thirds of their average weekly wage by the imposition of a benefit ceiling limiting them to an amount not in excess of the statewide average weekly wage. The Legislature saw fit to raise the ceiling, over a six year span, so that by 1981 the benefit ceiling would be elevated to double the statewide average weekly wage. By this "phased-in" approach the Legislature was seeking to avoid the strain on the system resulting from a sudden, immediate doubling of the highest level of available benefits. As the proponents of the amendments to escalate ceilings carefully pointed out, the amendment

> "removes in a gradual way a discriminatory provision against skilled workers which exists in our current law",

and it

> "give[s] to the employers in the state the opportunity to gradually assume this additional cost of doing business."[4]

The more specific inquiry then becomes: what particular kind of gradual approach did the Legislature adopt to remove the discrimination against skilled workers being caused by a benefit ceiling restricted to 100% of the statewide average weekly

---

**3.** In the more extended discussion we give this problem infra, at 1150–1151, we explain that the most appropriate accommodating interpretation is to read the "inflation-deflation" adjustment provision in Sections 54, 55 and 58, respectively, as if it were written:

"and such weekly compensation shall be adjusted annually on July 1st so that it contin-

ues to bear the same percentage relationship to the average weekly wage that it would have borne had it been computed at the time of the injury in like manner and on the basis of like status of incapacity."

**4.** Remarks of Senator O'Leary and Representative Tierney, 2 Me.Leg.Rec. B1915, B1943 (107th Leg., 1975).

wage? Cives would have us attribute to the Legislature a very narrow and extreme version of gradualness under which, despite the October 1, 1975 effective date of the amendatory legislation itself, the legislation is to be taken as prescribing *later, separate* effective dates for each of the respective ceiling escalations, and as establishing the date of injury, relative to each such effective date for ceiling escalation, to be *once and for all* determinative of the applicable compensation ceiling. This would mean that even though the enactment embodying the provisions for ceiling escalations became effective October 1, 1975, no one injured before July 1, 1977 would have any benefit from the legislation, and only those injured after July 1, 1981 would ever reach the ultimate ceiling of 200% of the statewide average weekly wage.

We find this an unacceptable interpretation of the statute.

The legislative history is replete with indications that the ceiling escalations were intended to provide a remedy against a discrimination which the Legislature perceived as affecting persons who would continue to be paid compensation in consequence of injuries sustained virtually contemporaneously with the effective date of the amendment, October 1, 1975. Throughout the legislative debate references are made to the perpetuation of the inequity which would be suffered by skilled workers whose present earnings would render any compensation to which they might become entitled subject to the average wage limitations if the amendatory proposal was not enacted. Senator Speers' remarks plainly envision that a worker "who *is* making" enough to become affected by the proposed amendment will benefit from the increase in

> "the maximum amount that he *may* receive . . . until in the year 1981 the maximum is declared to be twice the average weekly wage in the State of

Maine." 2 Me.Leg.Rec. B1914 (107th Leg., 1975) (emphasis supplied)

Beyond this, legislation internally providing that various of its parts are to become effective on dates widely different from the date on which the legislation would itself become effective is in our view sufficiently unusual to induce us to refrain from assigning such meaning unless the Legislature has used language that expressly, directly and unequivocally requires it. Here, the Legislature has not so spoken but, rather, has used the ambiguous phrase "as of July 1." Additional significance attaches to this legislative omission to use language unambiguously stating the result for which Cives contends, since the Legislature must be deemed to have known how to achieve that result by appropriate language had such been its purpose. The Legislature had available to it the concrete example of other proposals for legislation, as well as actual legislation, so providing. See, e. g., § 17(a) and (c) of "Workmen's Compensation and Rehabilitation Law, the Proposed Model Act drafted by the Council of State Governments" (referred to in The Report of the National Commission on State Workmen's Compensation Laws at 123 (1972)), and the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 906(b) and (d) (Supp.1978). Moreover, the Legislature had already given the very statutory sections to which the ceiling escalator provisions were added *exactly* this kind of plain and unequivocal treatment when it added the "inflation-deflation" adjustment provision in 1971. The operative language then used by the Legislature was:

> "This Act shall become effective January 1, 1972. This Act shall only apply to injuries occurring after its effective date." P.L.1971, c. 225, § 5.

In view of the Legislature's avowed purpose of effectuating the National Commission's recommendations,[5] we consider the

---

5. In his remarks on the legislation Senator Speers emphasized that the proposed enactment

> "follows precisely the [National Commission] recommendations not only as to the results

but as to the time schedule involved. So that by enacting this bill we are completely, totally, precisely in line with the recommendations made by the national commission." 2 Me.Leg.Rec. B1915 (107th Leg., 1975)

Legislature's omission of such limiting language in the ceiling escalator provisions highly probative of its intendment to alleviate the plight of all workers who would receive compensation by virtue of work-related injuries sustained after the effective date of the overall enactment, October 1, 1975, by giving all such workers the benefit of each increase in ceiling as phased in at two-year intervals over a six year period. If the ceiling escalator amendments were accorded the more restrictive meaning contended for by Cives, large numbers of these workers would continue to be victims of the inequitable discrimination the amendment sought to eliminate, not to retain with modifications.[6]

Having ascertained the function and purpose of the ceiling escalation provisions, we turn to examine their relation to the "inflation-deflation" adjustment provision. We find guidance as to the basic purpose of the "inflation-deflation" adjustment provision, which we have already shown to require reworking through interpretation to avoid anomalous results, in its legislative history. In one early draft, it required simply that compensation be increased whenever the statewide average weekly wage increased. The "Statement of Fact" attached to this early draft said that

> "[t]he purpose of this bill is *to permit increases* in certain Workmen Compensation benefits *whenever the average weekly wage in the state increases.*" (emphasis supplied)

Although the legislative history is silent regarding the reasons this early draft was deemed unsatisfactory, plainly a new draft was necessary to avoid requiring that compensation payments continue at an inflated level despite a general downward trend in wages. The legislative history is also silent as to expressions of the purpose underlying the changes made in the draft which was ultimately enacted, and there is no corresponding "Statement of Fact." Nonetheless, again it appears evident that the "inflation-deflation" adjustment provision, as enacted, was aimed at protecting injured workers against shrinkage in the value of the dollar caused by inflation, while simultaneously guaranteeing that during deflationary economic conditions the entire system would not suffer from inability to make appropriate adjustments in compensation payments.

■ We are satisfied that it is these limited purposes that the language "continues to bear the same percentage relationship" was used to express. It would therefore accord the phrase an overinclusive scope were it to be made the sole basis, despite numerous contrary indications, for blocking a full and fair implementation of the basic purposes of the *later-enacted* ceiling escalation provisions. As applicable in the instant circumstances, where the statewide average weekly wage has been increasing, both the ceiling escalation and the "inflation-deflation" adjustment provisions are aimed at increasing worker benefits, the "inflation-deflation" adjustment provision being intended to *reduce* benefits *only* when the statewide average weekly wage *decreases.*

■ To hold that the "inflation-deflation" adjustment provision demands denying the increased benefits to workers injured after the effective date of the enactment providing for escalations in ceilings would be to set one worker-protective enactment against another. It is our duty to avoid such inconsistency whenever there is available, as here, an alternative reading which leaves reasonable, and fair, operative

---

6. During the debate in the Senate, Senator Speers made the remark:
   "That is the whole purpose of the bill, simply to equalize an inequitable situation at the present time."
   Senator Conley agreed that:
   "[T]his bill primarily *equalizes* an injustice currently on the statutes . . . ." 2 Me. Leg.Rec. B1916 (107th Leg., 1975) (emphasis supplied)

The debate in the House was of the same tenor. Representative Pierce noted that
   "[T]his limitation is unfair and should be removed",
while Representative Tierney observed:
   "This bill addresses that discrimination, and over a six-year period of time *eliminates* it." Id. at B1943. (emphasis supplied)

scope to both enactments. See *Hanbro, Inc. v. Johnson*, 158 Me. 180, 181 A.2d 249 (1962). In similar circumstances we have stressed a statute's wider purposes over the narrow wording of a single portion. We continue to view it as

> "fundamental that we look to the purpose for which a law is enacted and that we avoid a construction which leads to a result clearly not within the contemplation of the lawmaking body . . . even though to do so we may have to disregard the strict letter of the enactment." *Town of Ashland v. Wright*, 139 Me. 283, 285, 29 A.2d 747 (1943)

See also *Reggep v. Lunder Shoe Products Co.*, Me., 241 A.2d 802, 805 (1968).

In sum, to allow the literal language of the "inflation-deflation" adjustment provision to have the effect for which Cives here contends would be doubly inappropriate: it would vitiate the force of another provision enacted to redress another inequity, and it would do so in the face of a *rising* average wage, the very occasion when a provision designed to adjust for inflation should help, not harm, compensation recipients.

We sustain that portion of the Commission's order that rejected the Cives contention and adjusted Bernard's compensation to reflect applicability to Bernard "as of July 1, 1977" of a ceiling escalator to 133⅓% of the statewide average weekly wage.

### 2–b.—The Commissioner's Application of the "Inflation-Deflation" Adjustment Provision.

After having recomputed the compensation award to Bernard on the basis that he was entitled to the benefit of an escalation in ceiling to 133⅓% of the statewide average weekly wage, the Commission proceeded to adjust that figure so as to reflect both the change in Bernard's status from total to partial incapacity and inflationary changes.[7] We find that the Commission reached cor-

rect results in making these adjustments. However, since our study of the problems involved has revealed to us that two methods, one proper and one improper, could produce the same results in this case and the Commission has not spelled out in detail the method it used, we deem it necessary for the future guidance of the Commission and the bar to explain the proper methodology.

■ The Commission's order included an express finding of 40% incapacity. The Act provides, as we hold is its correct interpretation, that compensation for partial incapacity shall be two-thirds of the difference between what the worker was earning before the injury and what he is capable of earning afterwards, but not to exceed the statewide average weekly wage, 133⅓% of that average as of July 1, 1977, and so on. Since, here, the difference between Bernard's "average gross weekly wages" ($299.00) before the injury and the "weekly wages . . . he is able to earn thereafter"—60% (his remaining capacity) of $299.00, or $179.40—was $119.60, Bernard was entitled to receive two-thirds of that figure, to wit, $79.73, unless that amount exceeded 133⅓% of the statewide average weekly wage. Since it did not, Bernard was properly awarded $79.73.

The Commission then undertook to apply the "inflation-deflation" adjustment provision. Having decreed that "the rate of compensation will be 40% of $199.33", but "modified" so that the ultimate figure is $93.42, the Commission increased its preliminary award of $79.73 by $13.69. It is as to this modification that in this case, fortuitously, two methods would yield the same correct result, but only one of the methods would be proper.

■ The improper method would be for the Commission to substitute for the statutorily-prescribed constant ratio between original compensation payment and

---

7. It appears that no inflation adjustment was made for the period of continuing total incapacity between July 1, 1977 and December 6, 1977. If there was such an oversight, since the omission has not been challenged and Bernard's

current compensation accurately reflects the operation of the escalator and "inflation-deflation" adjustment provisions, we consider it most appropriate under the circumstances to leave the Commission's order undisturbed.

original statewide average weekly wage the ratio between the original and current statewide average weekly wages, i. e., the average wage having increased by 17.17% (from $141.41 to $165.70), simply increase the compensation payment by an equivalent percentage (from $79.73 to $93.42). Because, here, it would happen that Bernard's rate of compensation would be revised downwards to a point well below one at which the statutory ceiling might have effect, the complications that can attend a change in the extent of incapacity or the operation of an escalation provision would not materialize in this particular instance. However, were the figures different, another clash between escalation provision and "inflation-deflation" provision would be presented; different figures would reveal, as we clarify infra, that simply calculating the percentage increase in statewide average wage since the time of injury and applying that ratio to the compensation payment as currently computed is not sufficiently responsive to the demands of the statutory scheme.

While such approach would take into account, correctly, that the ratio established at the time of the injury between the worker's then level of compensation and the then average weekly wage cannot be maintained as an absolute constant in the face of subsequent variations in the extent of the worker's incapacity, substituting a newly constructed ratio, as above described, would not be a proper solution of the problem posed by the inadvertent choice of language in which the Legislature embodied its intention to shield injured workers against inflation. The ratio legislatively contemplated must be applied in a manner most in harmony with the purpose behind the "inflation-deflation" adjustment provision which, as we have already discussed, is to provide fair and even handed protection against inflation without building into the system an artificial enhancement of benefits that might render compensation more attractive than employment.

"This Court is required to effectuate the intent of the Legislature, not its oversights." *Canning v. State Department of Transportation*, Me., 347 A.2d 605, 608 (1975).

The compound difficulties with the "inflation-deflation" provision revealed by this case are best resolved by adhering to the provision's mandate that

"*such* weekly compensation shall be adjusted annually on July 1st so that *it* continues to bear the same percentage relationship to the [statewide] average weekly wage . . . as *it* did at the time of the injury." (emphasis supplied)

On a literal reading of the statute, which we have shown to be unacceptable, the antecedent referred to by "such weekly compensation" would appear to be a figure unaffected by the intervention of factors specified by other provisions of the statute, one of which, indeed, the escalator provision, has been interposed in the statute *between* the phrase "such weekly compensation" and its former antecedent. It does no violence to the ambiguous language "such weekly compensation", and at the same time enables the entire statutory scheme to be applied rationally and fairly, if it is interpreted to refer to the compensation *as newly computed* to accommodate the intervention of other factors the statute requires to be taken into account. Thus the worker whose level of compensation is now based on newly-arisen factors is entitled to protection from inflation not at the rate established by his original compensation payment, but instead at the rate that *would have been* established if he had *then* been compensated in the light of the factors that *now* control his compensation.

Under this construction, adjustment is made to "such weekly compensation" *in its present form* so that *its* percentage relationship to the statewide average weekly wage at the time of injury remains a constant. The purpose of the "inflation-deflation" adjustment provision is most faithfully followed if it is applied as if it were written like this:

"and such weekly compensation shall be adjusted annually on July 1st so that it continues to bear the same percentage

relationship to the average weekly wage that it would have borne had it been computed at the time of the injury in like manner and on the basis of like status of incapacity."

Thus the proper methodology would be for the Commission to arrive at its inflation award by first fixing the rate of compensation Bernard *would have been* entitled to receive at the time of his injury on the basis of computations made in terms of the factors *now* relevant, by then determining the ratio between that figure and the statewide average weekly wage at the time of the injury, and by then awarding Bernard an equivalent proportion of the increase in the statewide average wage. On this approach Bernard's present award for 40% incapacity, to which adjustment for inflation is to be made, was $79.73.[8] The Commission would proceed properly by treating this 40% incapacity *as if it had been* the extent of Bernard's incapacity at the time of the injury, May 24, 1976, so that Bernard would then have received $79.73 (the lesser of "⅔ the difference, due to said injury, between his average gross weekly wages, earnings or salary before the injury and the weekly wages, earnings or salary which he is able to earn thereafter" or the statewide average weekly wage); this would establish the ratio between Bernard's compensation and the statewide average weekly wage at the time of injury as 56.4%. The statewide average weekly wage having increased $24.29 (from $141.41 to $165.70), Bernard would properly be awarded 56.4% of that increase, or $13.69. On each succeeding July 1st, if there is no change in extent of incapacity, Bernard will continue to receive 56.4% of the increase in the statewide average weekly wage.

The distinction between the proper and improper approaches above discussed emerges when the operation of an escalation provision or a change in extent of incapacity produces a current compensation payment that differs from what would have been awarded at the time of the injury.[9] Suppose that Bernard had been earning not $299.00, but $450.00 at the time of his injury, and that his injury had originally produced a 40% incapacity. Suppose further that by late 1979 Bernard's condition worsens so that he is determined to be totally incapacitated, and that as of July 1, 1979, when the ceiling is "phased-in" to rise to 166% of the statewide average weekly wage, that average has climbed to $200.00 per week.

Under the incorrect reading of the "inflation-deflation" provision, the Commission, after computing the current award as $300.00, (the lesser of two-thirds of the $450.00 figure for individual earnings or 166⅔% of the $200.00 statewide average weekly wage), would adjust for inflation by applying the ratio established by the change in the statewide average wage. The statewide average having increased by $58.59, or 41.4%, the Commission would increase the compensation award by $124.20.

Under the correct interpretation of the statute, the Commission would first compute the compensation Bernard *would have* received had he been both 100% incapacitated and entitled to the 166⅔% ceiling *at the time of the injury*. This preliminary figure, the lesser of $300.00 (two-thirds his $450.00 average earnings prior to the injury) or $235.73 (166⅔% of $141.41, the statewide average at the time of the injury), would establish a ratio of 166⅔% between compensation and statewide average wage at time of injury. This ratio would be applied to the change in the statewide average weekly wage, yielding an inflation adjustment of $97.67 (166⅔% of $58.59). Such a result, though considerably lower than the alternative figure of $124.20, best implements what we have discerned to be the legislative intendment: adjustments for inflation or

**8.** Computed as described at the outset of this section (2–b).

**9.** As it wrestles with such cases, the Commission may find solace in the point that the phasing-in of ceiling escalations will have been completed by 1981; thereafter, in the absence of a change in extent of incapacity, the "inflation-deflation" adjustment calculations will be relatively simple and basically repetitive.

deflation, despite intervening alterations in compensation as mandated by the overall statutory scheme, are to be keyed to the statewide average weekly wage that obtained at the date of the injury.

The entry is:

Appeal denied.

Further ordered that the employer, Cives Corporation, pay to the worker, Roger Bernard, an allowance of $550.00 for counsel fees plus his reasonable out-of-pocket expenses for this appeal.

McKUSICK, C. J., and ARCHIBALD, J., did not sit.